Egan Jr., J.
Respondents, Roxann M. (hereinafter the mother) and Harold SS. (hereinafter the father), are the parents of two daughters (born in 2008 and 2009). The children were removed from respondents’ care in February 2010 and, based upon respondents’ respective admissions, Family Court (Lawliss, J.) adjudicated the children to be neglected in May 2010. Petitioner thereafter commenced these proceedings in March 2011 seeking to terminate respondents’ parental rights upon the ground of mental illness. Following a fact-finding hearing, Supreme Court[1] granted petitioner’s applications and terminated respondents’ parental rights. These appeals ensued.
To terminate parental rights upon the ground of mental ill *1073 ness, the petitioning agency must demonstrate, by clear and convincing evidence, that the parent is — and for the foreseeable future will continue to be — unable to provide proper and adequate care for his or her children by reason of that parent’s mental illness (see Social Services Law § 384-b [4] [c]; Matter of Corey UU. [Donna UU.], 85 AD3d 1255, 1256 [2011], lv denied 17 NY3d 708 [2011]; Matter of Chelsea KK., 28 AD3d 849, 850-851 [2006], lv denied 7 NY3d 704 [2006]; Matter of Alexis X., 23 AD3d 945, 946 [2005], lv denied 6 NY3d 710 [2006]).[2] Such a showing, in turn, “must include ‘testimony from appropriate medical witnesses particularizing how the parent’s mental illness affects his or her present and future ability to care for the child[ren]’ ” (Matter of Burton C. [Marcy C.], 91 AD3d 1038, 1039 [2012], quoting Matter of Robert XX., 290 AD2d 753, 754 [2002]; accord Matter of Karen GG. [Marline HH.], 72 AD3d 1156, 1158 [2010], lv denied 14 NY3d 713 [2010]; Matter of Jenna KK., 50 AD3d 1216, 1217 [2008], lv denied 11 NY3d 703 [2008]). Based upon our review of the testimony offered by Richard Liotta,[3] the clinical psychologist who evaluated respondents, and upon giving due consideration to Liotta’s detailed and comprehensive written evaluations, which were received into evidence without objection, we are satisfied that petitioner met its burden of proof.
Liotta diagnosed the mother as suffering from a bipolar II disorder, an anxiety disorder not otherwise specified and a borderline personality disorder with significant dependent traits. Of these three conditions, Liotta opined, the mother’s borderline personality disorder, which he identified as her primary problem and described as severe, most impacted upon her ability to be an effective parent. According to Liotta, this particular disorder is characterized by impulsivity, emotional over-reactivity, excessive anger and a history of tumultuous and volatile interpersonal relationships — all symptoms or behaviors that the mother possessed or displayed. Additionally, Liotta testified that the dependent aspect of this disorder results in a strong *1074 need for an individual to enter into and remain in relationships despite the negative consequences thereof — a pattern that the mother repeatedly demonstrated in her relationship with the father.[4]
As to the impact upon the mother’s ability to care for the children, Liotta testified that the mother’s personality disorder negatively affects her parental judgment, insight and consistency, causes her to be impulsive and place her own needs ahead of the children’s needs and inhibits her ability to acknowledge her own behavior — leading Liotta to conclude that the mother was at a “high risk of [engaging in] behaviors that would place the children at risk.” With respect to the prospect for improvement, although Liotta acknowledged that the mother potentially “could be in a very different place” three or four years down the road, it is readily apparent that he holds out little hope in this regard, noting that “there is little indication that [the mother] is going to stop making poor choices anytime soon.”
In our view, the foregoing testimony establishes — by clear and convincing evidence — that the mother suffers from a mental illness that presently and for the foreseeable future precludes her from providing proper care for her children (see e.g. Matter of Burton C. [Marcy C.], 91 AD3d at 1039-1040; Matter of Jenna KK., 50 AD3d at 1217; Matter of Michael WW., 29 AD3d 1105, 1106 [2006]; Matter of Alexis X., 23 AD3d at 946-947). To the extent that Liotta suggested that certain aspects of the mother’s mental illness were amenable to treatment, the “mere possibility” that the mother’s condition could, with proper treatment, improve at some later date is an insufficient basis upon which to overturn Supreme Court’s sound determination (Matter of Vaketa Y., 141 AD2d 892, 893 [1988]; accord Matter of Burton C. [Marcy C.], 91 AD3d at 1041; Matter of Anthony K., 17 AD3d 732, 733 [2005]; see Matter of Charles FF., 44 AD3d 1137, 1138 [2007], lv denied 9 NY3d 817 [2008]; Matter of Evelyn B., 37 AD3d 991, 993 [2007]).
We reach a similar determination with respect to the father, who Liotta diagnosed as suffering from an anxiety disorder not otherwise specified and an antisocial personality disorder with narcissistic features. Although Liotta characterized the father’s anxiety disorder as “fairly mild,” he reached a contrary conclusion regarding the father’s personality disorder, opining that *1075 this latter condition would significantly interfere with the father’s ability to be an effective parent. Indeed, Liotta testified that the father possessed all the hallmarks of an antisocial personality disorder with narcissistic features, i.e., a history of behaviors that would be grounds for arrest, a pattern of deceitfulness, irresponsibility, impulsivity, irritability and aggressiveness, a lack of empathy or remorse and a self-centered lifestyle that disregards the safety and needs of others. According to Liotta, the father “essentially denied responsibility for . . . anything and everything that he had been accused of and that was documented” in either petitioner’s records or prior court orders and had a history of “telling people what they want[ed] to hear for his own end,” thereby evidencing both limited insight into his own behavior and a willingness to exploit other people. These deficits, coupled with the father’s “fairly chronic oppositional [behavior],” poor judgment and impulse control, lack of motivation and limited appreciation for the impact that his behavior has upon others, prompted Liotta to conclude that the children “would be at risk of abuse [and/or] neglect in his care.”[5] Additionally, the father’s lack of meaningful participation in treatment, as well as his consistent resistance to change and opposition to constructive recommendations, did not — in Liotta’s view — “bode well for future change.” Accordingly, there is clear and convincing evidence to support Supreme Court’s decision to terminate the father’s parental rights based upon mental illness.
Respondents’ remaining contentions, including their assertion that termination of their parental rights was not in the children’s best interests, have been examined and found to be lacking in merit.
Peters, P.J., Lahtinen, Kavanagh and Stein, JJ., concur. Ordered that the orders are affirmed, without costs.

. At some point, these proceedings apparently were transferred to the Integrated Domestic Violence part of Supreme Court.

. Mental illness is defined as “an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to such an extent that if such child were placed in or returned to the custody of the parent, the child would be in danger of becoming a neglected child” (Social Services Law § 384-b [6] [a]).

. Prior to testifying, Liotta separately interviewed the mother and the father on two occasions, administered various psychological and personality tests, reviewed pertinent Family Court orders and records maintained by petitioner and interviewed certain service providers. Additionally, with respect to the mother, Liotta reviewed applicable mental health records, including a prior psychiatric assessment and records pertaining to the mother’s psychiatric hospitalization in 2005.

. This relationship, which has been marked by domestic violence, began when the mother was 16 years old and the father was 30 years old and clearly remains very important to the mother. Notably, one of petitioner’s homeworkers testified that the mother once confided, “[I]f [I] were to lose the children, [I] would still have [their father] in [my] life.”

. Liotta also questioned how “genuinely invested” the father was in seeking the return of his daughters — a suspicion supported by the testimony of one of petitioner’s homemakers, who indicated that the father once said that “he didn’t cry in regards to his girls because he wasn’t as bonded to them as he was with his boy” from another relationship.